SKEELS v. SNOW.

1. TRIAL—APPEAL AND ERROR—FINDINGS OF FACT AND LAW.
   Where a case is tried by the court without a jury, and he
   makes findings of fact, they will not be disturbed, on error,
   if there is evidence to support them.

2. BROKERS—CONTRACTS—ATTORNEY AND CLIENT.
   Evidence considered and *held* to support the findings of fact
   made by the trial court in rendering judgment against an
   attorney at law who claimed commissions for an attempted
   sale of real property under an agreement with his client.

Error to Oceana; Davis, J., presiding. Submitted
April 15, 1910. (Docket No. 106.) Decided September
27, 1910.

Assumpsit by Rufus F. Skeels against Walter Snow
for services rendered. A judgment for defendant is re-
viewed by plaintiff on writ of error. Affirmed.

*Rufus F. Skeels* and *F. C. Wetmore*, for appellant.

*Cross, Vanderwerp, Foote & Ross*, for appellee.

MOORE, J. This case was tried before the judge who
made findings, the essential parts of which are as follows:

"(1) The plaintiff in this cause is a practicing at-
torney.

"(2) The defendant was a farmer and was on or about
January first, A. D. 1905, the owner of (certain lands
which are described in detail).

"(3) That on or about said date certain parties for
whom one Morton B. Wheeler of Grand Rapids was act-
ing, and with whom said Wheeler was interested, were
contemplating the building of a dam on White river, in
said county [Oceana], which might necessitate the use
of said lands for the purpose of flowage, and it was con-
templated and intended by the defendant in this action to

clear up, if necessary, such defects as there might be in the title to said lands, and to sell or dispose of the same to the said Morton B. Wheeler and his associates.

" (4) That, for the purpose of enabling said defendant to present a merchantable title to said lands and to procure the sale of the same to said Morton B. Wheeler and his associates, the defendant at about the time stated employed this plaintiff as his attorney in the matter of making his title in and to said lands merchantable, and to assist the defendant by his advice and services, as such attorney, in disposing of said property to said Wheeler and his associates.

" (5) For such purpose, at about the time named, plaintiff and defendant entered into an agreement, which, in substance, was as follows : Said plaintiff was to act for said defendant as his attorney in connection with perfecting the title to said lands, and in assisting said defendant to sell or dispose of the same to said Wheeler and his associates ; said defendant agreeing to pay the plaintiff, and the plaintiff agreeing to receive therefor, such reasonable attorney's fees as the plaintiff might from time to time become entitled to for all of his services, so to be rendered as aforesaid. Said defendant, in addition to the payment of such fees for all such services rendered, was to pay said plaintiff all his expenses and expenditures in connection with such work. In addition to such payment for services so to be rendered, and expenses and expenditures so incurred, said defendant agreed with the plaintiff that in case he, said defendant, should be able to sell to said Wheeler and his associates his rights in said property for the sum of $25,000, defendant would give said plaintiff from the proceeds from said lands the sum of $1,000; that, if such sale should be made for the sum of $16,000, said defendant would give said plaintiff from such proceeds the sum of $500, either of which sums, respectively, was to be given plaintiff only in case such sale should be made in such manner to said Wheeler and his associates, or some other person, and the same was to be completed, and that such sum was to be given said plaintiff only out of the proceeds of the sale of such land.

"(6) It was also understood and agreed between said parties that said defendant was to retain control of all the negotiations connected with such deal and was to determine the price at which such property should be sold, and reserved and retained the right to use all legitimate means

to obtain as large a price therefrom as possible, said plaintiff only to furnish such assistance therein as he might be requested to furnish.

"(7) Plaintiff has been paid by defendant in full, and something more, for all such services, expenses, and expenditures that he has rendered to, or incurred in connection with, such deal, or pursuant to such agreement.

"(8) On or about the 30th day of September, A. D. 1905, plaintiff and defendant met at the village of Holton in Muskegon county with one Russell Updyke, who was then and there acting with limited authority in behalf of said Morton B. Wheeler and his associates who had authority at that time only to negotiate for an offer by defendant for the purchase of defendant's rights in the property named, but who did not have authority at that time to close a deal for the purchase thereof, having only the power and right to obtain from defendant a proposition for such sale and purchase, and which it was necessary for him to present and submit to his principal, Morton B. Wheeler, then in the city of Grand Rapids, for acceptance or rejection, at which meeting and interview at Holton aforesaid said defendant did make a proposition to said Russell H. Updyke, the same being oral and not in writing, who received the same for and on behalf of said Wheeler, and who took the same to said Wheeler at Grand Rapids, and presented the same to him on the following day, viz., October 1, 1905, at which time said Wheeler rejected such proposition, and, instead thereof, made and instructed said Updyke to make to said defendant a counterproposition, but which counterproposition was never presented or made to defendant. On Monday, October 2, 1905, this defendant instructed plaintiff herein to withdraw the proposition that had been so made by defendant at Holton on September 30, 1905.

"(9) The proposition made by defendant at Holton was thereupon and on October 2, A. D. 1905, withdrawn after said Morton B. Wheeler had on October 1st determined to and had rejected the proposition made by defendant at Holton on September 30th, and such deal was not closed, nor has there been any such deal closed for the disposal of such property, and defendant is still the owner of such interest therein as he had at the inception of these arrangements.

"(10) That no change was made at any time in the

terms of the agreement between plaintiff and defendant made as the court has hereinabove found.

"Much of the testimony offered in behalf of the plaintiff in this cause was objected to on the part of the defendant, but the same was admitted subject to the objection of said defendant. From all the testimony admitted in said cause, I find the facts as above stated, and I find as conclusions of law:

"(1) That defendant is not indebted to plaintiff in any sum of money whatsoever.

"(2) That plaintiff has no cause of action against said defendant.

"Let judgment therefore be entered for the defendant, with costs to be taxed."

A request was made for other and different findings, which request was refused and exceptions taken thereto. The case is brought here by writ of error.

It is the claim of appellant that he is entitled to $800 for services rendered in procuring an arrangement by which Mr. Wheeler was willing to buy the lands for $6,800, and leave thereon a quantity of timber valued at $500. This claim is made upon the theory that, though no sale in fact was made, a sale was prevented by the act of defendant, and that plaintiff is entitled to the $800 the same as though a sale had been made. The record is quite voluminous. We shall state sufficient of it to present the questions involved. The defendant was the owner of certain lands. Mr. Wheeler was engaged in an enterprise which caused him to write defendant in February, 1905, about one of the descriptions, as follows:

"This is a piece of property that it is necessary for me to have in connection with my water power properties, which, of course, you know about, and wish to ask what you will take for this piece."

The defendant's reply is as follows:

"HOLTON, MICHIGAN, February 8, 1905.
"Mr. MORTON B. WHEELER,
            "Grand Rapids, Mich.
"*Dear Sir:* In reply to yours of Feb'y 6th, I have heard of your dam proposition through the Grand Rapids Press.

I own eight forties on White River and its tributaries and also own a saw mill and figure to sell them together. Would hardly care to break in on one forty. Any proposition you have to make will be given consideration it deserves. You may write my attorney at Hart, Mich., Mr. R. F. Skeels.

" Yours truly,
                " WALTER SNOW."

Before sending this reply, he inclosed both letters in one addressed to Mr. Skeels, the material parts of which are as follows:

"HOLTON, MICHIGAN, February 8–05.

" Mr. R. F. SKEELS,
                " Hart, Mich.

" *Dear Sir:* You will find inclosed letter from Mr. Wheeler and my answer thereto, but I was afraid to send it until you saw it, as they are trying to get some catch on me somewhere. If you do send it take a copy. * * * I figure that my knowledge, what land I own on White River, what I could buy on Manistee, would be worth good, big money to those people as I now control on White River two thousand horse power. I figure I ought to have $25,000. That would mean a $1,000 for you and the lowest would be $2,000 per forty and eight forties, $500.00 for the mill, which would be your money. I either get big money or none."

Mr. Skeels then did work for the defendant of a professional character for which he rendered bills, and payments were made to him by checks. He concedes he has been paid for these services, while defendant testified he had sent him payments amounting to $21.90 in excess of his bills. Negotiations were had with Mr. Wheeler, but he declined to pay $16,000 for the land.

Plaintiff testifies that the last of September, 1905, he received a letter containing the following:

" After you left. I think we had better deal if we can get six thousand and the timber on 29–32 and 33. Don't let the deal go down if you can help it.

" SNOW."

To which he replied:

"HART, MICH., Sept. 29, 1905.
"WALTER SNOW, Esq.,
          "Holton, Mich.

"*My Dear Sir:* Yours at hand and contents noted. I have doubts about getting them up to $6,000.00, but I am of the opinion I could close a deal somewhere around $5,000. I will not write them however until I hear from you as I want to know just how far I can go. * * * Now it is evident we are not going to get any such figure as we first thought we would, and before I close the deal with them I think it would be well for us to understand each other as to just how the proceeds are to be divided between us. In other words, favor me with reply at once and state just what I am to have if I close deal at $5,000, and just what I am to have if I get over $5,000 and under six thousand, and what I am to have if I get over six and under seven, and again at over seven and under eight, and again at over eight and under nine, and again at over nine and under ten. As long as the deal will be consummated, if at all, on different lines than we figured on, I think these better be determined before we get a deal closed. * * *

                "Yours truly,
                    "RUFUS F. SKEELS.

"P. S. Owing to the fact of my building and great expense I am to in connection therewith, kindly figure on whatever my portion is as being cash, and yourself handling whatever securities we see fit to take, if any."

He testified he got a reply by phone, and that he arranged an interview between himself, Mr. Snow, and Mr. Updyke, who represented Mr. Wheeler, at which time it was agreed the lands were to be taken by Mr. Wheeler at $6,800 and timber valued at $500 to be left for Mr. Snow. We now quote from his testimony:

"I stated to Mr. Snow, standing in front of the Temple, that I felt, inasmuch as I had got him $800 more than his letter had asked me to get, and that if I had closed at his figure he would have only received $5,500 out of it and I $500, according to his conversation with me by phone, that I felt I ought to have the $800. Mr. Snow then stated to me, if they would make the contract I suggested and close a deal in that manner, that he would give me $800. Mr. Updyke, Mr. Snow, and myself then went

into the parlors of the hotel at Holton, and we reduced the memorandum to writing.    I have it here and offer it in evidence."

Mr. Updyke had no authority to sign the memorandum for Mr. Wheeler, and it is claimed Mr. Snow did not sign it because he had told somebody he would not sell until a later date.    The memorandum was taken to Mr. Wheeler by Mr. Updyke and Mr. Wheeler at once addressed him as follows:

"This is October 2nd, 1905.
"R. H. UPDYKE.
"*Dear Sir:* In regard to the proposed deal with Mr. Snow, I have gone over the same very carefully and wish to say, that from my standpoint it will be absolutely impossible to make such a deal as he wants.    If Mr. Snow is willing to go in with us now on the chance of getting something or nothing, I would be willing to make a deal with the following conditions."

Then follow the details of a proposition.

"I have gone over this matter very thoroughly, and this is the stand I must take and it is up to Mr. Snow to do business if he will.    *    *    *    I feel quite sure Mr. Snow will be able to look at the matter in this light, and that we will be able to go along and work the deal out to our mutual advantage.
"Yours respectfully,
"M. B. WHEELER."

It is claimed this letter was given for the purpose of obtaining better terms from Mr. Snow, and that Mr. Wheeler gave Mr. Holmes and Mr. Updyke secret instructions to close the deal if necessary, according to the terms stated in the memorandum.    Before this letter was shown to Mr. Snow, he decided not to sell for less than $16,000, and so notified the plaintiff, who, in turn, notified Mr. Wheeler.    The lands had not been sold at the time the case was tried.    The defendant testified as follows:

"I have heard this correspondence all read.    I made a contract with Mr. Skeels at one time to do some business

for me, about as it was read there.  He was acting as my attorney.  Presented me with bills from time to time.  I think I paid all the bills.  Think he owes me $21.90 now. Except this $800 he claims here, I think I overpaid him $21.90, money he received from me in excess of the bills that he rendered.  I never at any time closed a deal with Mr. Updyke and Mr. Wheeler.  I have heard the testimony of Mr. Skeels.  There was no agreement of sale and purchase made between me and Mr. Updyke and Mr. Wheeler at Holton on the 30th of September, 1905.  We talked there from early morning till way along towards night, and at last we made him a proposition.  Mr. Updyke was to submit that proposition to his partner or company or whatever it was, for their acceptance or rejection.  On that day there was no acceptance of that proposition that I know of.  I didn't hear anything about it if there was.  I never heard of any acceptance at any time of the proposition.  I never made a sale of this property.  I have it yet, and in the same condition that it was at that time.  Never have sold or disposed of it to any one. In the negotiating or management of this affair as to the disposing of this property—securing it or disposing of it— Mr. Skeels was acting as an attorney for me.  I don't know anything about the negotiations he made for the sale of this property except what he told me."

It is apparent from this record that plaintiff was not employed as a broker to find a purchaser for this land.  Mr. Wheeler had opened negotiations contemplating a purchase.  Mr. Skeels, in addition to his professional work, was to aid in closing the deal.  The first letter from the defendant to the plaintiff indicated that compensation for this work depended upon the sale being made.  Mr. Skeels' letter of September 29, 1905, indicates the same thing, and it is a fair inference from his testimony about the $800 fee that it depended upon the consummation of the deal.

It is a well-settled rule of law where the case is tried by the judge who makes findings of fact that, if there is evidence upon which to base the findings, they will not be disturbed.  See *Cragin* v. *Gardner*, 64 Mich. 399 (31 N. W. 206); *Bateman* v. *Blaisdell*, 83 Mich. 357 (47 N. W.

223); *Smith* v. *Smith,* 144 Mich. 139 (107 N. W. 894); *Buckhout* v. *Browne,* 160 Mich. 460 (125 N. W. 370).

There is testimony tending to support the findings of fact.

Judgment is affirmed.

OSTRANDER, HOOKER, McALVAY, and BROOKE, JJ., concurred.